UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **CVETKO ZDRAVKOVSKI, et al.,** | **2:21-CV-12016-TGB-EAS** |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 21, 22)** |
| vs. | |
| **CHARTER TOWNSHIP OF REDFORD, et al.,** | |
| Defendants. | |

Plaintiff Cvetko Zdravkovski served as the Ombudsman for Defendant Charter Township of Redford ("the Township" or "Redford Township") from July 2018 until March 26, 2019, when he was terminated by a unanimous vote of the Township Board of Trustees. Zdravkovski claims that Defendants Lily Cavanagh, Linda Jackson, Elizabeth Kangas, and Kimberly Taylor masterminded his ouster as a form of retaliation. Defendants respond that Zdravkovski was removed as Ombudsman for legitimate reasons following an investigation into alleged misconduct. To Zdravkovski, these individual Defendants colluded to vote as a political bloc, using their votes as four of seven members on the Township Board of Trustees to dictate the Board's decisions, including his termination as Ombudsman.

Approximately nine months after his termination from the Ombudsman position, Zdravkovski says he gained an appointment as

Deputy Township Supervisor. From December 2019 to July 2020, Zdravkovski contends that he acted as the Deputy Supervisor but was never compensated. But according to Defendants, the Board never formally approved Zdravkovski's appointment as Deputy Supervisor or his salary. Moreover, they say, Zdravkovski actually performed no work as Deputy Supervisor.

All the while, Zdravkovski alleges that Defendants were spreading defamatory rumors about his involvement in illegal activities, including smuggling drugs and guns. Defendants acknowledge that they heard such rumors from various sources, but all insist that the rumors began circulating in 2018 or 2019—long before the one-year statute of limitations period for a defamation claim began in August 2020.

Zdravkovski filed a complaint raising numerous state and federal claims: (1) tortious interference with business relationships related to his Ombudsman and Deputy Township Supervisor positions under Michigan law (Counts I and II); (2) promissory estoppel/quantum meruit related to his Deputy Township Supervisor position under Michigan law (Count III); (3) First Amendment retaliation under 42 U.S.C. § 1983 (Count IV); (4) violation of Fourteenth Amendment substantive due process rights under § 1983 (Count V); (5) violation of Fourteenth Amendment equal protection under § 1983 (Count VI); (6) conspiracy to violate constitutional rights under 42 U.S.C. § 1985 (Count VII); (7) intentional infliction of emotional distress ("IIED") under Michigan law (Count VIII);

(8) concert of action and civil conspiracy under Michigan law (Counts IX and X); and (9) defamation (Count XI).

Defendants[1] have moved for summary judgment on all claims. ECF Nos. 21, 22. For the reasons explained below, Defendants motions for summary judgment will be **GRANTED**.

## I.   BACKGROUND

From July 2018 until his termination on March 26, 2019, Zdravkovski[2] served as the Ombudsman of Redford Township. In this role, Zdravkovski was tasked with providing guidance to local businesses "regarding compliance with applicable ordinances, regulations, processes and procedures" and "providing leads for new businesses to join and engage in the Redford Township Community." Defendants' Exh. A, ECF No. 22-1, PageID.436–37.

---

[1] Defendants Redford Township, Taylor, Jackson, and Cavanagh have filed a joint motion for summary judgment (ECF No. 22). The Court refers to this motion as "Defendants' Motion for Summary Judgment." Defendant Kangas filed her own motion for summary judgment separate from the other Defendants (ECF No. 21). The Court refers to this motion as "Defendant Kangas's Motion for Summary Judgment."

[2] Zdravkovski also brings suit on behalf Plaintiff Aleksander Makedonski Konsultacci, LLC ("AMK"), the business entity he operated and used to bid on the Ombudsman contract. Defendants' Exh. B, ECF No. 22-2, PageID.442 (business meeting minutes reflecting that the Ombudsman contract was awarded to AMK on July 10, 2018). In addition, Zdravkovski goes by the names "Steve DiMaggio" and "Steve Zdravkovski." For consistency, the Court refers solely to Zdravkovski in discussing his positions as Ombudsman and Deputy Supervisor.

The Township Board of Trustees initially approved Zdravkovski's Ombudsman contract for a period of 12 months with compensation not to exceed $30,000 per year. *Id.* at PageID.438; Defendants' Exh. B, ECF No. 22-2, PageID.442. Defendants Cavanagh, Jackson, and Kangas, along with one other Board member voted in favor of Zdrakovski's contract. Plaintiffs' Opp. to Summary Judgment, ECF No. 24, PageID.692. Defendant Taylor voted against the contract. *Id.*

On January 22, 2019, the Board extended Zdravkovski's Ombudsman contract through December 31, 2020 and increased his compensation to $52,000 per year paid at a rate of $1,000 per week. ECF No. 24, PageID.694; Plaintiffs' Exh. 5, ECF No. 24-6, PageID.740–41. Among other Board members, Defendants Cavanagh, Jackson, and Kangas voted in favor of the contract and pay increase. Defendants' Motion for Summary Judgment, ECF No. 22, PageID.400. Defendant Taylor was the only Board member who voted against the contract. *Id.*

Shortly after the Board approved Zdravkovski's Ombudsman contract extension and pay raise, Defendant Taylor expressed concerns about the increased spending. Defendant Taylor believed that the Board was "being short-sighted in spending money for an Ombudsman position when … the money would be put to better use in hiring and [sic] Economic Development Director." Plaintiffs' Exh. 6, PageID.746. Defendant Taylor specifically indicated that "[t]he $52,000 salary" for an Ombudsman was "just for 'leads' and a friendly face," whereas an Economic Development

4

Director would be "a professional that could do so much more for the township." *Id.* Defendant Kangas disagreed, telling Defendant Taylor that she would "not chang[e] my vote on the ombudsman." *Id.* at PageID.746. Defendant Taylor later accused Defendant Kangas of having "no objective reasoning" on the Ombudsman issue. *Id.* at PageID.745.

Defendant Jackson wrote directly to Zdravkovski to explain that the salary increase "completely changes my expectations for this position." Defendants' Exh. E, ECF No. 22-5, PageID.457. Defendant Jackson outlined five specific tasks she expected Zdravkovski to complete "to justify this increase," while emphasizing that the Ombudsman's primary responsibility should be "to get new businesses established in Redford." *Id.* Similarly, Defendant Jackson wrote to other Board members to request that Zdravkovski's contract be amended to reduce his salary back to $30,000—but with "a commission of up to $22,000 … payable when the Ombudsman is credited with new businesses that the assessor enters into Redford Township tax rolls." Plaintiffs' Exh. 8, ECF No. 24-9, PageID.751. Defendant Jackson noted that she "didn't want to vote for [the Ombudsman pay increase] in the first place," and sought to "eliminate any risk to the Township if [Zdravkovski] does not bring in any new business." *Id.*

Around this same time, in February 2019, Zdravkovski circulated "Business Outreach Surveys" to local businesses with the goal of "improv[ing] communication and relationships between businesses and

local government." Defendants' Exh. F, ECF No. 22-6, PageID.461. In a number of surveys submitted by Zdravkovski to the Board, the responses from business owners included a comment mentioning that Zdravkovski was the reason why they opened businesses in Redford Township. ECF No. 22, PageID.401. Oddly, these positive comments were all made in response to the question asking: "Can you describe any benefits specific to being located in Redford Township?" Plaintiffs' Exh. G, ECF No. 22-7. In one instance, Delon Hanni, the owner of Gonella's Sub Shop wrote, "Mr. Ombudsman, Steve [referring to Zdravkovski] talked us to come [sic] to Redford." *Id*.; *see also* Plaintiffs' Exh. 11, ECF No. 24-12, PageID.758.

On March 5, 2019, Board member Don Wood reached out to Adam Pielecha, a Township employee, after hearing from Defendant Taylor that Pielecha had information on Zdravkovski's interaction with Hanni regarding the survey form. ECF No. 22, PageID.402; Plaintiffs' Exh. 10, ECF No. 24-11, PageID.756. Pielecha explained that Hanni told him that he had only met Zdravkovski once after he had already opened his store and attributed no credit to Zdravkovski for opening a business in Redford. *Id.* On March 11, 2019, another Township employee, Bruce Marsalese, wrote a statement indicating that Hanni asked Marsalese whether he was familiar with Zdravkovski. Defendants' Exh. J, ECF No. 22-10, PageID.541. Marsalese reported that Hanni told him that Zdravkovski had "requested a letter stating how he had helped [Hanni]

6

get into his shop," when Hanni had found the site independently without Zdravkovski's assistance. *Id.*

That same day, Hanni corroborated Marsalese's account in an email to Marsalese, summarizing that Zdravkovski wanted Hanni to sign the survey "which states that he is the one that found me the building to move my business into. HE DID NOT!" Defendants' Exh. K, ECF No. 22-11, PageID.543. On January 17, 2023, Hanni signed an affidavit attesting that Zdravkovski "[had] nothing whatsoever to do with my business being located in Redford," and he filled out the survey presented to him by Zdravkovski "despite it containing false information because Zdravkovski asked me to and I did not realize the reason behind it." Defendant Kangas's Exh. 11, ECF No. 21-12, PageID.337–38.

On March 26, 2019, the Board held a meeting to discuss Zdravkovski's conduct and the Township attorney's investigation into the Hanni incident. Defendant Kangas's Exh. 13, ECF No. 21-14, PageID.351. The Board entered a closed session "to hear the legal opinion regarding the Ombudsman position from [the Township's] attorney," and reconvened in an open session to vote on terminating Zdravkovski's Ombudsman contract. *Id.* The six present Board members, including Defendants Taylor, Jackson, Cavanagh, and Kangas, all voted to terminate the contract. *Id.* Although Defendants attested that their votes to terminate Zdravkovski as Ombudsman were based on his conduct related to the survey, ECF No. 22, PageID.404, Zdravkovski contends

7

that Defendants used the survey as pretext for firing him. ECF No. 24, PageID.709, PageID.711. Specifically, Zdravkovski insists that Defendants saw him as a "political threat," and suggests that Defendants coerced Hanni into claiming that Zdravkovski influenced him to falsify the survey information. *Id.* at 709.

Approximately nine months after being terminated from the Ombudsman position, Zdravkovski was appointed as Deputy Township Supervisor by Board member and Township Supervisor Tracey Kobylarz. Plaintiffs' Exh. 18, ECF No. 24-19, PageID.781. Kobylarz did not raise the issue of appointing a Deputy Supervisor with Defendants or other Board members. Instead, Kobylarz swore in Zdravkovski as Deputy Supervisor after the December 10, 2019 Board meeting concluded and did so outside the presence of other Board members and the public. ECF No. 22, PageID.408. Only Zdravkovski and Kobylarz signed the contract appointing him Deputy Supervisor, but the contract itself noted that "[t]his agreement memorializes the employment agreement that is currently in effect as of December 10, 2019, between the Charter Township of Redford (Township) and Steve Zdravkovski." Plaintiffs' Exh. 18, ECF No. 24-19, PageID.781.

Zdravkovski contends that between December 2019 and July 2020, he performed duties as the Deputy Township Supervisor but was never compensated. Zdravkovski Dep. (Apr. 13, 2022), Defendant Kangas's Exh. 1, ECF No. 21-2, PageID.254–55. The December 10, 2019 contract

8

indicated that Zdravkovski was to be paid "[b]i-weekly compensation" of $2,501.50. Plaintiffs' Exh. 18, ECF No. 24-19, PageID.781. Defendants explain that the Board did not formally approve Zdravkovski's appointment to the Deputy Supervisor position or the salary Zdravkovski claims he should have been paid, nor did Zdravkovski actually perform any work as Deputy Supervisor. Defendant Kangas's Mot. for Summary Judgment, ECF No. 21, PageID.203–05; ECF No. 22, PageID.408–09. Indeed, Defendants point out that Kobylarz did not attend any of the Board meetings where the Deputy Supervisor position was to be discussed, and it was her responsibility to ensure the Board approved the contract she and Zdravkovski signed. *Id.* Zdravkovski resigned from the Deputy Supervisor position in July 2020. Zdravkovski Dep. (Apr. 13, 2022), ECF No. 21-2, PageID.256–57.

While Zdravkovski was serving as Ombudsman and Deputy Supervisor, Zdravkovski alleges that Defendants spread defamatory rumors about him dealing drugs and smuggling weapons. *Id.* at PageID.258–59. Defendants concede that they heard such rumors but ultimately deny making any defamatory statements themselves. ECF No. 21, PageID.205–06; ECF No. 22, PageID.411. Instead, they assert that the rumors began circulated in 2018 or 2019—long before the one-year statute of limitations period for a defamation claim began in August 2020. Zdravkovski acknowledges that he first became aware of the

9

rumors while he served as Ombudsman between July 2018 and March 2019. Zdravkovski Dep. (Apr. 13, 2022), ECF No. 21-2, PageID.259.

## II.   LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In general, on a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The party opposing summary judgment "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention

10

to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

### A. Zdravkovski's Defamation, Tortious Interference, Intentional Infliction of Emotional Distress, and Promissory Estoppel Claims

#### 1.   Defamation

##### a. Whether Plaintiffs' Defamation Claim Is Barred by the Statute of Limitations

Defendants argue that Zdravkovski's defamation claim is barred by the one-year statute of limitations applicable to libel and slander under Michigan law. ECF No. 21, PageID.216–17; ECF No. 22, PageID.414–15; *see also* MCL § 600.5805(11). Zdravkovski agrees that his defamation claim is subject to a one-year limitations period. ECF No. 24, PageID.699. But he maintains that his defamation claim is timely because two Redford residents attested that they heard Defendants Taylor and Kangas repeat the alleged defamatory statements as recently as November 2020—less than a year before he filed his complaint in August 2021. ECF No. 24, PageID.700; Jammo Aff. (Mar. 12, 2023), ECF No. 24-20, PageID.784; Yanish Aff. (Mar. 12, 2023), ECF No. 24-26, PageID.846.

11

In *Mitan v. Campbell*, the Michigan Supreme Court held that the limitations period for a defamation claim runs "from the date of the original alleged defamatory statement," not from "the date the statement was republished by a third party." 706 N.W.2d 420, 420–21 (Mich. 2005). The *Mitan* court made clear that a defamation claim accrues when the defamatory statement is made by the defendant for the first time, as the statute of limitations "does not contemplate extending the accrual of the claim on the basis of [third-party] republication, regardless of whether the republication was intended by the speaker." *Id.* at 422.

But in *Redmond v. Heller*, the Michigan Court of Appeals distinguished *Mitan* as inapplicable in cases where there is no third-party republication. The *Redmond* court emphasized that *Mitan*'s rule was limited to situations where the plaintiff merely seeks to hold the defendant liable for a third party's republication of the defendant's prior defamatory statement. 957 N.W.2d 357, 369 (Mich. Ct. App. 2020). By contrast, *Mitan* did not address "circumstances where the speaker repeated the defamatory statement over time or where the speaker made separate and distinct defamatory statements over time." *Id.* Even so, the court summarized that a defamation claim must be "premised on … allegations of distinct defamatory publications that occurred within the one-year period of limitations." *Id.* Any of the defendant's alleged defamatory statements "made more than one year before plaintiffs filed their complaint" cannot form the basis of a timely defamation claim. *Id.*

Here, it is undisputed that the alleged defamatory statements regarding Zdravkovski's involvement in drug dealing and firearms smuggling were first made in 2018 or 2019, when Zdravkovski served as Ombudsman. Zdravkovski Dep. (Apr. 13, 2022), ECF No. 21-2, PageID.258–59 (acknowledging that Zdravkovski became aware of the statements while he was Ombudsman); ECF No. 22, PageID.411–12 (summarizing affidavits of various Redford citizens that were all executed in 2019). To maintain a timely defamation claim, Zdravkovski must show that Defendants repeated those statements after August 30, 2020. *See L. Enf't Officers Sec. Unions v. Int'l Unions, Sec. Police & Fire Pros. of Am.*, No. 20-12544, 2021 WL 3667220, at *3 (E.D. Mich. Aug. 18, 2021) ("Defendants can be liable for each original publication of a defamatory statement and any republishing of alleged defamatory statements that occurred within the one-year statute of limitations.").

Defendants urge the Court not to consider the affidavits Zdravkovski submitted from previously undisclosed witnesses attesting that they heard Defendants Jackson and Kangas repeat the alleged defamatory statements. Defendants' Reply, ECF No. 26, PageID.895 n.1. Although a court may strike previously undisclosed evidence submitted in opposition to a summary-judgment motion, Defendants did not take proper steps for the Court to formally disregard the testimony by filing a motion to strike. *Cf. Pullins v. NWS Michigan, Inc.*, No. 07-13146, 2008 WL 11355516, at *4 (E.D. Mich. July 2, 2008) (Friedman, J.) (striking

13

affidavits from previously undisclosed witnesses attached to the Plaintiffs' summary judgment response after the defendant filed a motion to strike); *Doe v. Livonia Pub. Sch.*, No. 13-11687, 2018 WL 500249, at *4 (E.D. Mich. Jan. 22, 2018) (Levy, J.) (striking previously undisclosed expert report attached to the Plaintiffs' summary judgment response after the defendants filed a motion to strike). Because Defendants failed to timely move to strike the affidavits, the Court will consider them for summary-judgment purposes.

Based on the affidavits submitted by Zdravkovski, whether Defendants Kangas and Jackson made the alleged defamatory statements after August 30, 2020 is a material fact in dispute, such that summary judgment on statute of limitations grounds is inappropriate for these two Defendants. However, as to Defendants Taylor and Cavanagh Zdravkovski has failed to present evidence that Defendants Taylor and Cavanagh made any defamatory statements after August 30, 2020. Therefore, Defendants Taylor and Cavanagh are entitled to summary judgment on Zdravkovski's defamation claim.

### b. Whether Zdravkovski's Defamation Claims Are Viable as a Matter of Law

#### i. Whether Defendants Are Entitled to Absolute Immunity for Alleged Defamation

Defendants contend that they are entitled to absolute immunity against all intentional tort claims (including defamation) because any alleged misconduct was taken while acting within the scope of their

authority as Township Board members. ECF No. 21, PageID.218–19; ECF No. 22, PageID.419. Zdravkovski does not appear to contest that Defendants may be considered "legislators" for absolute-immunity purposes. *See Hutchinson v. Twp. of Portage*, No. 240136, 2003 WL 21958278, at *3 (Mich. Ct. App. Aug. 14, 2003) (holding that township trustees were entitled to absolute immunity for "acts that were within the scope of their authority as township supervisor and township trustee, respectively, because they are considered legislators"); MCL § 691.1407(5) ("A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority."). Zdravkovski responds that Defendants cannot claim absolute immunity because they were acting outside the scope of their authority when they allegedly defamed him. ECF No. 24, PageID.701.

"The determination whether particular acts are within [a governmental actor's] authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government." *Marrocco v. Randlett*, 433 N.W.2d 68, 73 (Mich. 1988). Defendants assert that publishing the alleged defamatory statements to the two affiants was

within the scope of their authority. Defendants sparsely support this argument by claiming that—at least with respect to one conversation— the statements were generally related to the November 2020 election. ECF No. 27, PageID.896.

But neither party meaningfully explains why the Defendants interacted with these two Redford citizens, in what specific context the statements were made, what official acts Defendants purported to be performing, and whether any formal policy permitted Defendants to engage in the conduct alleged. In short, the record contains insufficient information to determine whether Defendants are entitled to absolute immunity as a matter of law. And viewing the minimal facts in the light most favorable to Zdravkovski, a reasonable jury could conclude that these statements were not made pursuant to Defendants' official duties. *See Anders v. Cuevas*, 984 F.3d 1166, 1188 (6th Cir. 2021) (reversing dismissal of the plaintiff's defamation claim on absolute immunity grounds because the defendant "offers no support to suggest that governmental immunity is a license to make defamatory statements about matters not before the city council simply because the individuals or entities defamed are the *subject* of official city council business").

### ii. Whether Zdravkovski Can Demonstrate Actual Malice

To state a claim for defamation, the plaintiff must show:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting

16

at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010).

Defendants further argue that Zdravkovski was a public figure— an important contention that Zdravkovski does not rebut. ECF No. 22, PageID.417; ECF No. 27, PageID.895. At the time of the actionable defamatory statements, Zdravkovski served as Deputy Township Supervisor. It is thus undisputed that Zdravkovski was a public official who cannot recover for defamation unless he demonstrates that Defendants made the statements with "actual malice," meaning that "the publication was made with knowledge of the falsity of the statements or with reckless disregard of their truth or falsity." *Ireland v. Edwards*, 584 N.W.2d 632, 637 (Mich. Ct. App. 1998); *see also Milkovich v. Lorain J. Co.*, 497 U.S. 1, 14 (1990). The plaintiff must demonstrate actual malice by clear and convincing evidence. *Milkovich*, 497 U.S. at 15.

Even assuming Zdravkovski can prove the basic elements of a defamation claim, the record is bereft of any evidence upon which a reasonable jury could find that Defendants made the statements with actual malice. "The term 'malice' in the actual malice standard does not equate to a showing of ill will." *Smith*, 793 N.W.2d at 541. Instead, Zdravkovski bears the burden "to show a subjective awareness on the part of [Defendants] of the falsity of [their] statements." *Lins v. Evening*

17

*News Ass'n*, 342 N.W.2d 573, 580 (Mich. Ct. App. 1983). Zdravkovski has presented no evidence that Defendants Kangas and Jackson subjectively knew the statements they published were false.

Unable to show actual knowledge of the falsity of the statements, Zdravkovski may also attempt to raise an issue of fact regarding actual malice if he can demonstrate that Defendants acted with reckless disregard for the truth. Here, the record evidence reflects that Defendants heard the rumors about Zdrakovski's conduct both from each other and from other Redford citizens, and made no attempts to verify the statements before allegedly repeating them. Defendant Taylor, who is alleged to have originated the alleged defamatory statements among Defendants, claims that she heard them from "a person with law enforcement connections" and had "no reason … to question the truth of the claim." ECF No. 22, PageID.417.

But "[f]ailure to verify statements is not determinative of actual malice, even when biased sources are relied upon." *Lins*, 342 N.W.2d at 580. Similarly, "[r]eckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation." *Grebner v. Runyon*, 347 N.W.2d 741, 744 (Mich. Ct. App. 1984). Indeed, Zdravkovski has the onerous burden of proving that Defendants "in fact entertained serious doubts concerning the truth of the statements" before publishing them. *Id.* Zdravkovski can point to no evidence that Defendants entertained such

18

serious doubts. Therefore, Defendants Kangas and Jackson are entitled to summary judgment on Zdravkovski's defamation claim because on this record no reasonable jury could find that they published the alleged defamatory statements with actual malice.

### 2. Tortious Interference with Business Relationships

#### a. Whether Zdravkovski's At-Will Employment Bars Tortious Interference Claims

To sustain a claim for tortious interference with business relationships, Zdravkovski must prove:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005).

The business relationships at issue are Zdravkovski's employment agreements with the Township for his roles as Ombudsman and Deputy Township Supervisor. Relying on one line of Michigan Court of Appeals cases, Defendants argue that there can be no breach of contract because Zdravkovski was an at-will employee. *See Dzierwa v. Mich. Oil Co.*, 393 N.W.2d 610, 613 (Mich. Ct. App. 1986) (concluding that because the "plaintiff's employment contract was terminable at will, there could be no breach arising from its termination"). In response, Zdravkovski points

19

to another line of Michigan Court of Appeals cases holding that at-will employment does not bar such an employee from bringing a tortious interference claim. *Feaheny v. Caldwell*, 437 N.W.2d 358, 364 (Mich. Ct. App. 1989) (holding that "an at-will employment contract is actionable under a tortious interference theory of liability").

The Michigan Supreme Court has not decisively resolved the issue. *See Stanek v. Greco*, 323 F.3d 476, 479 (6th Cir. 2003) (recognizing the unresolved split among the Michigan Courts of Appeal and lack of "unified approach to suits brought against supervisors sued by former at-will employees for tortious interference with the employment contract"). But even if the Court considers tortious interference with at-will employment to be a viable claim, Zdravkovski still faces "the very difficult obstacle of showing that each defendant stood as a third party to the employment contract" and committed "per se wrongful acts or did lawful acts with malice and without justification." *Feaheny*, 437 N.W.2d at 364. Therefore, as discussed below, whether Defendants stood as third parties to the contracts and whether they acted with malice and without justification are dispositive elements of Zdravkovski's tortious interference claims.

### b. Whether Defendants Stood as Third Parties to the Business Relationships and Acted with Malice and Without Justification

Under Michigan law, "[t]he *sine qua non* of a tortious interference claim is that the defendant must be a third party to the contractual

relationship or expectancy in question; a person who is a party to a contract cannot logically 'interfere' with it." *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 781 (E.D. Mich. 2010) (Murphy, J.). When assessing the conduct of individual actors vis-à-vis an organization's business relationships, "[i]t is possible to sustain a claim for tortious interference against corporate officers or employees" who interfered with the organization's business relationships. *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1275 (E.D. Mich. 2011) (Borman, J.).

But "the plaintiff must prove that [the individual officers or employees] stood as third parties to the business relationship at issue," by showing that "the defendant employees or officers were acting pursuant to their own motives and interests, as opposed to the service of the employer." *Id.*; *see also Reed v. Mich. Metro Girl Scout Council*, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993) ("[C]orporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."). Moreover, as relevant here, where an individual has authority to enter into and terminate employment agreements on behalf of an organization, they generally cannot be considered a third-party to the business relationship. *Dzierwa*, 393 N.W.2d at 613.

In *Burger v. Ford Motor Co.*, the Michigan Court of Appeals emphasized that for an at-will employee to bring tortious interference claims against individual employees of the defendant company who

terminated his employment, he was required to show that those employees "act[ed] for strictly personal reasons." No. 307312, 2014 WL 132444, at *3 (Mich. Ct. App. Jan. 14, 2014). There, the defendant company's board of directors unanimously voted to terminate the plaintiff's employment after "hear[ing] findings and a recommendation made by ... a personnel relations representative ... regarding her investigation of complaints received by [the company] about plaintiff's conduct." *Id.* at *1. Although the plaintiff asserted that "there may have been deficiencies" in the investigation, and one defendant testified that he knew he would serve as the plaintiff's replacement if the plaintiff was fired, such evidence was insufficient to survive summary judgment on a tortious interference claim. *Id.* at *3. Consequently, the court concluded that the defendants did not act as third parties to the business relationship and could not be liable for tortious interference.

Just as in *Burger*, no reasonable jury could find that Defendants acted as third parties to the business relationships at issue here. First, it is undisputed that the Township Board members had the authority to enter into and terminate business relationships on behalf of the Township. Defendants' Exh. B, ECF No. 22-2, PageID.442 (Board meeting minutes documenting Defendants' votes to approve Zdravkovski's appointment as Ombudsman); Defendant Kangas's Exh. 17, ECF No. 21-18, PageID.386 (Board meeting minutes documenting Defendants' votes to "postpone discussion regarding duties and

22

compensation of the Deputy Supervisor"). The record evidence establishes that the Board formally voted and unanimously agreed to terminate Zdravkovski's Ombudsman contract after discussing Zdravkovski's alleged misconduct and subsequent investigation with Township counsel. And in compliance with the 30-day notice provision of the Ombudsman contract, the Board approved payment to Zdravkovski for 30 days from the date of the termination vote. Defendant Kangas's Exh. 13, ECF No. 21-14, PageID.351.

With respect to the Deputy Township Supervisor position, Zdravkovski claims that Defendants were "playing games" in failing to approve his pay, Zdravkovski Dep. (Apr. 13, 2022), ECF No. 21-2, PageID.254, but has presented no evidence to support this belief. Specifically, Zdravkovski has no evidence that Defendants' tabling of such discussions was done for an improper purpose or what Defendants would have gained by failing to consider his appointment to Deputy Supervisor. Moreover, as the Township Supervisor who appointed Zdravkovski, Kobylarz concedes that no individual Board member had authority to set Zdravkovski's pay as Deputy Supervisor, and his compensation was subject to Board approval. Kobylarz Dep. (Sept. 15, 2022), ECF No. 21-6, PageID.300. Kobylarz also equivocated on whether she needed to bring the Deputy Supervisor approval to the Board's attention or whether it was the Clerk of the Board's responsibility. *Id.* at PageID.299–300. But no Defendant served as Clerk, and it is undisputed

23

that Kobylarz did not attend any meetings where issues related to the Deputy Supervisor role were to be discussed. ECF No. 21, PageID.204.

Second, for largely the same reasons, no reasonable jury could find that Defendants acted with malice and were unjustified in their actions. Zdravkovski is required to present "proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference." *Feaheny*, 437 N.W.2d at 364. All Board members—including Defendants—attested that their vote to terminate Zdravkovski from the Ombudsman position related to his alleged misconduct in coercing Hanni's survey answer. Zdravkovski himself agreed that assuming the allegations related to the Hanni survey were true, such conduct would be considered unacceptable. Zdravkovski Dep. (Apr. 13, 2022), ECF No. 22-18, PageID.602.

Despite Zdravkovski's subjective belief that Defendants acted with malice and without justification, there is no evidence to support such a claim. Zdravkovski relies on emails where some Defendants expressed dissatisfaction with the Ombudsman pay increase to suggest that they had ulterior motives in terminating him. *See* Plaintiffs' Exh. 6, ECF No. 24-7; Plaintiffs' Exh. 7, ECF No. 24-8; Plaintiffs' Exh. 8, ECF No. 24-9; Plaintiffs' Exh. 9, ECF No. 24-10. But these emails were exchanged six to eight weeks before Zdravkovski's termination, and they do not reveal malice toward Zdravkovski nor any obvious benefit Defendants would have gained by terminating him. At most, the emails demonstrate that

some Defendants had acrimonious relationships with each other, but they do not advance Zdravkovski's theory that they collectively plotted to interfere with his work as Ombudsman.

Lastly, Zdravkovski was terminated by a unanimous vote of all four Defendants—including those who had previously supported his appointment to Ombudsman and his raise—along with two other Board members who were not alleged to have had any animus toward Zdravkovski. Accordingly, Zdravkovski's tortious interference claims fail as a matter of law. *See Feaheny*, 437 N.W.2d at 364 (affirming dismissal of the plaintiff's tortious interference claim because "the evidence failed to demonstrate that any of the defendants acted out of a personal motive to harm [the plaintiff] or to otherwise acquire pecuniary advantage"). Summary judgment is granted in favor of Defendants on Zdravkovski's tortious interference claims.

### 3.    Intentional Infliction of Emotional Distress

An intentional infliction of emotional distress ("IIED") claim requires proving four elements: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985). Defendants contend that none of their conduct rose to the level of being extreme and outrageous, and that Zdravkovski has not demonstrated that he suffered severe emotional distress. ECF No. 21, PageID.221–22; ECF No. 22, PageID.423–24. The Court agrees.

25

First, extreme and outrageous conduct is an exceptionally "strict standard." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir. 1996). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999). As such, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not constitute extreme and outrageous behavior. *Id.*

In general, where a "defendant had a legal right to terminate plaintiff's employment with or without cause under the employment agreement signed by plaintiff," an IIED claim fails as a matter of law. *Ledl v. Quik Pik Food Stores, Inc.*, 349 N.W.2d 529, 533 (Mich. Ct. App. 1984). For example, even where an employee's firing involves "chas[ing] an employee through the halls" of the workplace while "shouting and yelling" at them, such conduct is not considered extreme and outrageous. *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1047 (E.D. Mich. 2011), *aff'd*, 504 F. App'x 408 (6th Cir. 2012). And an employee's discharge after declining her supervisor's sexual advances is considered "repulsive," but not sufficient to be extreme and outrageous conduct. *Trudeau v. Fisher Body Div., Gen. Motors Corp.*, 423 N.W.2d 592, 594 (Mich. Ct. App. 1988). Additionally, where an IIED claim "also relies on alleged defamatory

statements that could not overcome First Amendment limitations," an IIED claim based on the alleged defamatory statements must be dismissed. *Millen v. Birdseye*, No. 357290, 2022 WL 4390517, at *6 (Mich. Ct. App. Sept. 22, 2022), *appeal denied*, 987 N.W.2d 201 (Mich. 2023).

As discussed above, Zdravkovski's defamation claim fails as a matter of law. Consequently, Zdravkovski cannot rely on defamation as a basis for his IIED claim. Furthermore, Defendants terminated Zdravkovski from the Ombudsman position with reasonable justification. No reasonable jury could conclude that Defendants terminated Zdravkovski with the intent to cause extreme emotional distress. The termination itself, which was unanimously voted upon in an open Board meeting, can hardly be considered the type of extreme and outrageous employment action necessary for an IIED claim. With respect to the Deputy Supervisor position, Zdravkovski complains that he was subject to "indignities including: being humiliated before the public at town hall meetings; not allowed to preside over meetings; and not being allowed a key fob to enter the Township Hall Building." ECF No. 24, PageID.707. These grievances, if true, amount to exactly what Zdravkovski calls them: *indignities*. But indignities are not extreme and outrageous conduct required for an IIED claim.

Second, emotional distress must go beyond what "normally accompanies" the tort or misconduct at issue and must be so severe that "no reasonable man could be expected to endure it." *Roberts*, 374 N.W.2d

27

at 611. Accordingly, the plaintiff must generally present "evidence of grief, depression, disruption of life style, or of treatment for anxiety or depression" to recover for IIED. *Id.*; *see also Williams v. AK Steel Corp.*, No. 18-11485, 2020 WL 2836287, at *14 (E.D. Mich. May 31, 2020) (finding that the plaintiff failed to demonstrate severe emotional distress because "he has not been treated for any type of distress or emotional suffering, and he is not taking any medication as a result of the events that occurred that were associated with his employment by Defendant").

Here, Zdravkovski claims that his emotional distress involves embarrassment, being "upset," sleeplessness, and "anxiety." Zdravkovski Dep. (Apr. 13, 2022), ECF No. 24-7, PageID.851–52. But these reactions are the kind that one would normally expect to accompany the alleged misconduct at issue. Zdravkovski has no evidence that he is receiving medical treatment for his anxiety or suffered any other distress that rises to the requisite level of severity for an IIED claim. Accordingly, summary judgment is granted in favor of Defendants on Zdravkovski's IIED claim.

### 4. Promissory Estoppel/Quantum Meruit

Zdravkovski raises a promissory estoppel claim based on alleged promises by Defendants to pay him for his services as Deputy Township Supervisor. Zdravkovski requests relief in the form of quantum meruit. To succeed on a promissory estoppel claim, the plaintiff must demonstrate:

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided.

*Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). In general, the court must "exercise caution in evaluating an estoppel claim and should apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubted." *Id.*

But here, Zdravkovski cannot bring promissory estoppel or quantum meruit claims because an express contract exists. Under Michigan law, "a contract will be implied only if there is no express contract covering the same subject matter." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993). In other words, "quasi-contractual remedies such as promissory estoppel are inapplicable where the parties have made an express contract covering the same subject matter." *Reinhart v. Cendrowski Selecky, P.C.*, No. 239540, 2003 WL 23104222, at *9 (Mich. Ct. App. Dec. 30, 2003); *see also Meisner L. Grp. PC v. Weston Downs Condo. Ass'n*, 909 N.W.2d 890, 903 (Mich. Ct. App. 2017) ("For quantum meruit or unjust enrichment to apply, there must not be an express contract between the parties covering the same subject matter.").

It is undisputed in this case that Zdravkovski signed a written contract (in the form of a document titled "Employment Agreement") with Kobylarz purporting to bind Defendant Redford Township to pay for his

services as Deputy Supervisor. Plaintiffs' Exh. 18, ECF No. 24-19, PageID.781. Indeed, in his complaint, Zdravkovski references that the purported promise was made "on or about December 11, 2019," the same date that he signed the written employment agreement. Complaint, ECF No. 1, PageID.6–7. And the "breach" alleged is Defendants' failure to compensate Zdravkovski for his work at the rate set out in the Employment Agreement. *Id.* While Defendants contend that Kobylarz did not have the authority to bind Defendant Redford Township to the contract without the Board's approval of Zdravkovski's salary and duties, there is no genuine dispute that the Employment Agreement constitutes an express contract covering the precise subject matter now in controversy. In fact, so long as a contract exists, even if the parties "dispute its terms or effect," the plaintiff cannot bring promissory estoppel or quantum meruit claims. *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993), *aff'd*, 47 F.3d 1167 (6th Cir. 1995).

Whether Zdravkovski could have raised a breach of contract claim based on the express contract is not at issue, because he has failed to plead such a claim. But because the Employment Agreement constitutes an express contract covering the same subject matter as his promissory estoppel claim, Zdravkovski's promissory estoppel and quantum meruit claims fail as a matter of law. Summary judgment therefore must be granted in favor of Defendants on these claims.

### B. Zdravkovski's § 1983 Claims

#### 1. Defendants' Qualified Immunity Against Zdravkovski's § 1983 Claims

Zdravkovski also brings claims under 42 U.S.C. § 1983 alleging violations of his constitutional rights under the First and Fourteenth Amendments. Defendants invoke qualified immunity against these claims. "Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cartwright v. City of Marine City*, 336 F.3d 487, 490 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (Stevens, J., dissenting)). A qualified immunity defense triggers two inquiries: (1) whether the plaintiff's constitutional rights have been violated; and (2) whether that right was "clearly established" at the time of the violation, such that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court may address these two inquiries in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Turning to these inquiries, the Court first addresses whether Zdravkovski has established violations of his constitutional rights.

#### 2. First Amendment Retaliation

Zdravkovski claims that Defendants violated his First Amendment rights by terminating him from the Ombudsman role because of his

political associations. A prima facie case of First Amendment retaliation requires the plaintiff to prove that:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by his protected conduct.

*Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). If the plaintiff satisfies their prima facie burden, "the burden then shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000). And "[u]nlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012).

Defendants contend that Zdravkovski cannot demonstrate that he engaged in constitutionally protected activity nor that his termination was causally related to such activity. Moreover, Defendants insist that even if Zdravkovski could make out prima facie case, Defendants would have terminated him regardless of his protected conduct.

In general, protected conduct related to political association includes "political belief, expression and affiliation, partisan political activity, or expression of opinion." *Carver v. Dennis*, 104 F.3d 847, 853

(6th Cir. 1997). Here, Zdravkovski generally contends that "he was deemed by Defendants to be a person associated with individuals who were an electoral threat to Defendants," and he was a "political threat" because of his fundraising abilities and "influence with business investors." ECF No. 24, PageID.711. But none of this suggests that Zdravkovski had any particular political belief or partisan affiliation that Defendants would have opposed. While the First Amendment protects a broad range of political activity, Zdravkovski's bald assertions that he was "very active" in politics and constituted a "political threat" to Defendants cannot suffice to satisfy the protected activity element. *See Cvarovsky v. Vill. of Newburgh Heights*, No. 09-2797, 2010 WL 3895064, at *5 (N.D. Ohio Oct. 1, 2010) (explaining that the plaintiff could not demonstrate protected political activity because he did not "identify particular statements or activity, or even the subject matter of the statements or activity that Plaintiff contends constitute protected political expression").

But even assuming Zdravkovski could demonstrate that he engaged in protected activity, there is no evidence from which a reasonable jury could find that his protected conduct was causally related to his termination. For example, Zdravkovski testified that he is not a member of any political party, supports both Democrats and Republicans, and previously supported all four individual Defendants in their campaigns. Zdravkovski Dep. (Apr. 13, 2022), ECF No. 21-2, PageID.233–34. Without

additional evidence that Defendants had turned against Zdravkovski or felt politically threatened by him for some specific reason, no reasonable jury could conclude that Defendants fired him for his political activity.

Moreover, as discussed above, Zdravkovski has not established a genuine dispute of material fact as to the reason for his termination. Again, aside from his subjective belief that Defendants were threatened by his political clout, Zdravkovski has presented no evidence to permit a reasonable jury to find that any protected activity caused his termination. Therefore, Defendants are entitled to qualified immunity and summary judgment on his First Amendment retaliation claim. *See Wallace v. Wayne Cnty.*, 602 F. App'x 223, 229-30 (6th Cir. 2015) (finding that the plaintiff's First Amendment retaliation claim failed as a matter of law because the plaintiff "could not link his political affiliation or speech to [the defendants'] decision to terminate him" and could not show that he was fired for "improper reasons" rather than the "budgetary concerns" proffered as defendants' valid justification). Without an underlying constitutional violation, Defendants are entitled to qualified immunity against Zdravkovski's First Amendment retaliation claim.

### 3. Fourteenth Amendment Substantive Due Process and Equal Protection

Zdravkovski alleges that his termination from the Ombudsman position and Defendants' failure to compensate him for his work as Deputy Township Supervisor violated his substantive due process rights

under the Fourteenth Amendment. Zdravkovski also claims that he suffered unequal treatment while serving as Deputy Township Supervisor in violation of the equal protection clause of the Fourteenth Amendment. In his response to Defendants' motions for summary judgment, Zdravkovski concedes his Fourteenth Amendment equal protection claim. ECF No. 24, PageID.710. Therefore, summary judgment will be granted in favor of Defendants on that claim. The Court proceeds to address the merits of Zdravkovski's Fourteenth Amendment substantive due process claim.

Substantive due process "protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "A substantive due process right may be implicated when a public employee is discharged for reasons that shock the conscience." *Perry v. McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000); *see also Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996) ("For a claim brought under substantive due process where a non-fundamental right is implicated, the plaintiff must show that the conduct 'shocks the conscience' of the court.").

Importantly, "[a]bsent the infringement of some 'fundamental' right," or conscience-shocking conduct, "the termination of public employment does not constitute a denial of substantive due process."

35

*Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992); *see also Houchens v. Beshear*, 850 F. App'x 340, 343–44 (6th Cir. 2021) ("The Supreme Court has not included the right to maintain public employment as a substantive due process right specifically protected under the Fourteenth Amendment."). So, "[t]o the extent that a substantive due process claim is available, [the plaintiff] must demonstrate that the Township's decision to terminate his employment had no rational basis." *Young v. Twp. of Green Oak*, 471 F.3d 674, 685 (6th Cir. 2006).

Defendants are entitled to qualified immunity against Zdravkovski's Fourteenth Amendment substantive due process claim. First, as previously discussed, Zdravkovski cannot demonstrate that his First Amendment rights were infringed when he was terminated for reasons unrelated to his purported protected activity. Consequently, Zdravkovski's termination from public employment is not rooted in any fundamental right protected by the Constitution.

Second, although Zdravkovski insists that his termination based on the Hanni survey was "a bogus set up to execute a pretextual termination," ECF No. 24, PageID.709, he presents no evidence to support this claim. Even assuming Defendants relied on inaccurate information in deciding to terminate him, "[t]he Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350 (1976). No reasonable jury could conclude based on this record that Defendants

terminated Zdravkovski without rational basis or in a conscience-shocking manner.[3]

Lastly, Zdravkovski contends that Defendants' "intentional failure to address the obligation of the Trustees and Township to compensate" him for his work as Deputy Supervisory "is shocking to the conscience." ECF No. 24, PageID.710. Setting aside the fact that Zdravkovski fails to point to any evidence suggesting that Defendants improperly prevented him from being paid as Deputy Supervisor, Zdravkovski also provides no substantive support for his claim that such conduct is conscience shocking. Perhaps unsurprisingly, the Court has not identified any case law to support this argument.

---

[3] Zdravkovski also suggests that he has a protected interest related to "his reputation, integrity and honor." ECF No. 24, PageID.709. "The Sixth Circuit has repeatedly recognized a constitutionally protected liberty interest in a person's 'reputation, good name, honor, and integrity.'" *Brown v. City of Detroit*, 259 F. Supp. 2d 611, 621 (E.D. Mich. 2003) (collecting cases). But a claim related to "stigmatizing governmental action" that damages the plaintiff's reputation requires proving numerous elements, including public disclosure, foreclosure of the opportunity to practice the plaintiff's chosen profession, and entitlement to name-clearing. *See Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996); *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410–11 (6th Cir. 1997). Aside from this singular reference to his protected interest in his reputation, Zdravkovski makes no attempt to demonstrate that Defendants have taken stigmatizing governmental action that would trigger Fourteenth Amendment protections. To the extent Zdravkovski intended to raise a substantive due process claim based on stigmatizing government action, Defendants are entitled to summary judgment.

To the contrary, the Sixth Circuit has emphasized that "[t]he substantive Due Process Clause is not concerned with the garden variety issues of common law contract." *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990). Indeed, "[g]overnments breach contracts virtually every day without dire consequences ensuing to the human dignity or basic autonomy of the promisees." *Id.* The fact that Zdravkovski was not compensated for his work as Deputy Supervisor falls far short of establishing a Fourteenth Amendment violation. Defendants are thus entitled to qualified immunity against Zdravkovski's Fourteenth Amendment substantive due process claim.

### C. Zdravkovski's Conspiracy Claims

Zdravkovski also brings conspiracy claims related to the tort law and constitutional claims he raises. Specifically, Zdravkovski brings civil conspiracy and concert of action claims under Michigan law, as well as conspiracy under 42 U.S.C. § 1985. But for the reasons detailed above, all claims underlying Zdravkovski's conspiracy claims must fail. Without successfully demonstrating an underlying tort or constitutional violation, Zdravkovski's conspiracy claims cannot succeed as a matter of law. *See Urban v. Beierling*, 835 N.W.2d 455, 464 (Mich. Ct. App. 2013) ("Given that plaintiff has not established that defendants committed an underlying tort, she cannot sustain her claims of concert of action and civil conspiracy."); *Bartlett v. Washington*, 793 F. App'x 403, 408 (6th Cir. 2019) ("[I]f there is no underlying constitutional violation, there can be

38

no claim for conspiracy [under 42 U.S.C. § 1985] either."). Therefore, summary judgment is granted in favor of Defendants on Zdravkovski's civil conspiracy, concert of action, and § 1985 claims.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** in favor of Defendants on all claims. Plaintiffs' case is **DISMISSED with prejudice.**

**IT IS SO ORDERED.**

Dated: September 30, 2023

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE